IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

PAULA MARIE ZACHARY                                                                        PLAINTIFF

VS.                           Civil No. 2:19-cv-02006-PKH-MEF

ANDREW M. SAUL, Commissioner,
Social Security Administration                                                          DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Paula Marie Zachary, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying her claim for a period of disability, disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  42 U.S.C. § 405(g).

I.     **Procedural Background**

Plaintiff filed her applications for DIB and SSI on September 1, 2016, due to back problems, back pain, fibromyalgia, a nervous breakdown, and neuropathy.  (ECF No. 11, pp. 19, 215).  Plaintiff alleged an onset date of May 1, 2016.  (*Id*.).  Her claims were denied initially on February 7, 2017, and upon reconsideration on June 9, 2017.  (*Id*., pp. 19, 111-13, 128-30).  An administrative hearing was held on February 13, 2018, in Fort Smith, Arkansas, before the Hon. Bill Jones, Administrative Law Judge ("ALJ").  (*Id*., pp. 39-57).  Plaintiff was present and represented by counsel, Michael Hamby, at the hearing.  (*Id*.).  Larry Seifert, a vocational expert

1

("VE"), also testified at the hearing. (*Id.*).

By written decision dated June 28, 2018, the ALJ found Plaintiff's disorder of her back, obesity, borderline personality disorder, chronic post-traumatic stress disorder, and early onset cyclothymia[1] to be severe, but that Plaintiff's impairments did not meet or equal the level of severity of any impairment in the Listing of Impairments. (*Id.*, p. 22-26). The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to:

> [P]erform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except she can occasionally climb, balance, stoop, kneel, crouch, and crawl. She is limited to jobs with simple, routine, and repetitive tasks involving only simple, work-related decisions, with few, if any, workplace changes. She can have no more than incidental contact with coworkers, supervisors and the general public and will need a cane to ambulate.
> (*Id.*, pp. 26-32).

With the assistance of a vocational expert ("VE"), the ALJ found Plaintiff would be unable to perform her past relevant work as actually or as generally performed, but she would be able to perform the representative occupations of: Compact Assembler (DOT No. 739.687-066), with 4,685 jobs in the national economy; Ampoule Sealer (DOT No. 559.687-014), with 17,391 jobs in the national economy; or, Dowel Checker (DOT No. 669.687-014), with 6,215 jobs in the national economy. (*Id.*, p. 32-33). The ALJ found Plaintiff had not been disabled under the definition of the Act from May 1, 2016 through the date of his decision. (*Id.*, p. 33).

On November 9, 2018, the Appeals Council denied Plaintiff's request for review. (*Id.*, pp. 6-8). Plaintiff then filed this action on January 4, 2019. (ECF No. 1). This matter is before the undersigned for report and recommendation. Both parties have filed appeal briefs. (ECF Nos. 15, 16). The case is ready for decision.

---

[1] Cyclothymia is a rare mood disorder that causes emotional ups and downs that are not as severe as those in bipolar I or II disorder. *See Cyclothymia (cyclothymic disorder)* at https://www.mayoclinic.org/diseases-conditions/cyclothymia/symptoms-causes/syc-20371275 (last accessed November 15, 2019).

## II. Relevant Evidence

The undersigned has conducted a thorough review of the entire record in this case. The complete sets of facts and arguments are presented in the parties' briefs and are repeated here only to the extent necessary.

At the administrative hearing held on February 13, 2018, Plaintiff testified that she made it to the 10th grade in school but had learning difficulties so she was in special classes for both math and English. (ECF No. 11, pp. 43, 48). Although not discussed at the hearing, Plaintiff's disability report shows she later earned a GED. (*Id.*, p. 216). Plaintiff testified she continued to have difficulties reading and writing. (*Id.*, p. 43).

Plaintiff testified that she had both anger outbursts and frequent crying episodes, and this had caused her to lose her last job. (*Id.*, p. 44). At the time of the hearing, she said these incidents happened about once a week anytime she was in public - as she had issues dealing with people. (*Id.*, pp. 44-45). When she had crying episodes, she would cry on and off all day, and when she had anger issues, she might punch a wall or self-harm. (*Id.*). Plaintiff testified that at her last job she was crying on and off all day, and this caused her supervisors to become concerned. (*Id.*, p. 45). She also had two episodes at work where she "zoned out," had difficulties filling out paperwork, and near the end, she missed up to 10 days of work per month due to falling. (*Id.*, pp. 48, 53-55).

Plaintiff testified she had numbness and swelling in her feet and legs every day. (*Id.*, pp. 59-50). She elevated her feet while she slept, which alleviated the swelling somewhat, and if she noticed swelling during the day, she would elevate them for two hours at a time, usually twice a day. (*Id.*). The numbness was constant. (*Id.*). Standing or walking more than 15 to 20 minutes worsened her swelling and numbness. (*Id.*).

3

Plaintiff testified that she had back pain daily that was a 7 or 8 on a 10-point pain scale, but it would drop to a 4 or 5 with medication. (*Id*., p. 47). She had been discussing having a second back surgery, but her surgeon, Dr. Johnson, had recently had a heart attack and she did not have a surgery scheduled. (*Id*., pp. 46-47). Plaintiff also testified that her doctors had expressed an unwillingness to go forward with a needed back surgery until she lost some weight, but that she had put on about 30 pounds in the last few months. (*Id*., pp. 47-48).

Plaintiff testified that her medications did alleviate her back pain, but made her drowsy, occasionally dizzy, and sometimes unable to function. (*Id*., p. 49). Her Clonazepam[2] and Hydrocodone[3] caused a lot of memory problems and difficulties sleeping. (*Id*., p. 46).

Plaintiff testified that she could not lift more than 10 pounds, or climb stairs, ladders, and scaffolds, but she could go up ramps with her walker. (*Id*., pp. 52-53). Plaintiff testified that her walker and cane had been prescribed because she had suffered some falls, and she used her walker and cane all the time, including at home. (*Id*.). Her knees hurt daily and made it difficult for her to get up from a sitting position, but she would be okay once she started to walk. (*Id*., p. 51).

Plaintiff testified there was very little she could do around the house. (*Id*., p. 57). She lived with her husband, her brother, and their friend. (*Id*., pp. 57-58). The friend who lived with them assisted her husband, who was also disabled, and helped with taking care of the house. (*Id*., pp. 57-58).

---

[2] Clonazepam is used to treat panic attacks and belongs to a class of drugs known as benzodiazepines. *See Clonazepam, at* https://www.webmd.com/drugs/2/drug-14403-6006/clonazepam-oral/clonazepam-oral/details (last accessed Nov. 19, 2019).

[3] Hydrocodone is a combination medicine sold under the brand names of Lortab, Norco, or Vicodin used to relieve moderate to severe pain. It contains an opioid (narcotic) pain reliever (hydrocodone) and a non-opioid pain reliever (acetaminophen). *See Hydrocodone-Acetaminophen*, *at* https://www.webmd.com/drugs/2/drug-251/hydrocodone-acetaminophen-oral/details (last accessed November 14, 2019).

The medical evidence of record shows:

In 2015, Plaintiff was being treated by Arthur M. Johnson, M.D., a neurosurgeon at Mercy Hospital, for low back and left leg pain. (*Id*., pp. 321, 323, 329, 388). She had already tried physical therapy with lumbar traction and had modest pain improvement and much improved gait and balance. (*Id*., pp. 321, 323). She had also tried a transforaminal epidural steroid injection and reported modest relief for 7-10 days. (*Id*.). However, she was still experiencing severe left leg pain with numbness and tingling, which interfered with her activities of daily living and she had expressed a desire to pursue surgical options. (*Id*.). Plaintiff was advised that her obesity decreased her chances of improving and was advised to lose weight. (*Id*.). However, Dr. Johnson decided to move forward with surgery and performed a left L3-4 foraminotomy/discectomy on September 15, 2015, as she had been in pain for three years and had not responded well to conservative treatment. (*Id*., p. 328). Two weeks later, Plaintiff was seen by Maria Cabrera, RN, for follow up after her surgery and had a normal gait and improved left leg pain. (*Id*., p. 388). At her one month follow up visit, Plaintiff was walking with a cane and had fallen three times, with her first fall occurring while feeling weak after a colonoscopy. (*Id*., p. 329). She reported moderate improvement since surgery and increased strength, but that her left leg had given out on her several times. (*Id*.). Plaintiff's husband reported she was getting around better and seemed to be in less pain than before the surgical intervention. (*Id*.). Dr. Johnson noted Plaintiff's gait, station, strength, and sensation were all grossly normal. (*Id*., p. 330). On November 5, 2015, Dr. Johnson advised Plaintiff that she could safely lift about 20 pounds, could drive, and increase her activity gradually over the next 2-3 months. (*Id*.).

Later that month on November 23, 2015, Plaintiff saw Beena Syed, M.D., at Mercy

Clinic and reported she was unable to get up from a chair due to her back, and she had fallen several times in the past two weeks due to her leg giving way. (*Id.*, p. 375). She reported that muscle pain, tightness and numbness in her left leg started not long after her back surgery. (*Id.*). Dr. Syed referred her to physical therapy for her back and neuropathic left leg pain, and a walker was prescribed for her frequent falls. (*Id.*, p. 378). Plaintiff saw Dr. Syed again on December 14, 2015 and reported her 5 mg of hydrocodone made her pain mild, but it never went away completely. (*Id.*, p. 371). She did report some hand swelling which was worsened when loom knitting or typing, but she had no leg swelling. (*Id.*). She had reduced range of motion in her back, 3/5 power in her left leg and an unsteady gait. (*Id.*, p. 373). Dr. Syed planned to get an MRI of Plaintiff's lumbar spine, advised her to use her walker, increased her hydrocodone to 10 mg three times daily, and referred her to physical therapy. (*Id.*, 373-74). There is no evidence of record that Plaintiff attended the prescribed physical therapy; a request for medical evidence was sent to Greenwood Physical Therapy Center for all records from May 2015 through December 2016, but no records were available. (*Id.*, p. 453).

On May 26, 2016, Plaintiff had her second post-operative visit with Dr. Johnson, and she continued to report lower left leg weakness but moderate improvement since the surgery. (*Id.*, p. 332). Dr. Johnson removed the lifting restriction of 20 pounds and continued to advise Plaintiff to increase her physical activity. (*Id.*, p. 334). He further advised Plaintiff to lose weight and opined that no further surgical intervention would benefit her, particularly due to her morbid obesity. (*Id*, p. 360). She was also referred to pain management. (*Id.*).

Plaintiff went to Valley Behavioral Health in February 2017 to seek treatment for some issues with bipolar disorder (which she reported had been diagnosed at the age of 12), as well as anxiety, self-harm, sleep disturbance, and trauma. (*Id.*, pp. 464-494). She was diagnosed with

6

moderate bipolar II, most recent episode depressed, in partial remission, and post-traumatic stress disorder (PTSD) with delayed expression. (*Id*., p. 494). She was seen again in April 2017 and reported her anxiety was bad at that time. (*Id*., pp. 657-59).

Plaintiff saw Dr. Syed on June 14, 2017 and reported that her pain medications were helping her. Dr. Syed continued her hydrocodone 10 mg tablets and advised her to continue with exercises, heat therapy, and additional Tylenol on an as-needed basis. (*Id*., p. 692).

Plaintiff sought help at Western Arkansas Counseling and Guidance Center (WACGC) on August 8, 2017 for unresolved grief due to her mother passing away a year previously. (*Id*., p.724). Plaintiff was then taking Clonazepam and Rexulti[4]. (*Id*.). She was diagnosed with Bipolar II Disorder, depressed, with anxious distress, in partial remission. (*Id*., p. 727). On September 13, 2017, Plaintiff returned for a mental status examination. She reported that the Rexulti had stabilized her mood but had caused her to gain weight. (*Id*., p. 719). She further reported that during manic periods she was irritable, screamed, yelled, and made everyone stay away from her. She was experiencing flashbacks, nightmares, exaggerated startle responses, hypervigilance, and avoidance related to a traumatic experience. (*Id*.). Her diagnoses were listed as bipolar II disorder and PTSD. (*Id*., pp. 720-21). Plaintiff was prescribed Welbutrin[5] for depression, hydroxyzine[6] for anxiety, and Ambien[7] to help her sleep. (*Id*., p. 721). Her dosage of Rexulti was not increased as she reported it had caused some weight gain. (*Id*.). Plaintiff continued to be treated at WACGC through January 18, 2018. (*Id*., p. 715).

---

[4] Rexulti is used to treat mood disorders and belongs to a class of drugs called atypical antipsychotics. *See Rexulti, at* https://www.webmd.com/drugs/2/drug-169294/rexulti-oral/details (last accessed November 15, 2019).
[5] Wellbutrin is used to treat depression. *See Wellbutrin, at* https://www.webmd.com/drugs/2/drug-13509/wellbutrin-oral/details (last accessed November 15, 2019).
[6] Hydroxyzine is an antihistamine that can also be used short-term to treat anxiety. *See hydroxyzine, at* https://www.webmd.com/drugs/2/drug-7681/hydroxyzine-hcl-oral/details (last accessed November 15, 2019).

Plaintiff returned to Dr. Syed on September 18, 2017 for left knee and ankle pain that had started several months before and had increased progressively. (*Id*., p. 693). Plaintiff could not recall any trauma to the affected leg, and she reported the pain was worse when standing up from a sitting position. (*Id*.). Dr. Syed opined her knee and ankle pain were most likely due to osteoarthritis, and he recommended weight loss and heat therapy, along with Naproxen to be used when necessary. (*Id*., p. 698). X-rays of Plaintiff's ankle and knee showed soft tissue swelling at the ankle and minimal early degenerative spurring about the medial compartment of her knee. (*Id*., pp. 699-700). Plaintiff saw Thomas Cheyne, M.D., on October 3, 2017, for knee and ankle pain and was given a combination injection of Decadron and Marcaine for degenerative arthritis of the knee. (*Id*., p. 702-03). She was also prescribed 15 mg daily of meloxicam and was scheduled to return in three weeks for follow up, however, there is no evidence of a second visit in the record. (*Id*.).

Plaintiff saw Dr. Syed again on December 17, 2017, with worsened anxiety due to the recent death of her father, and she reported her chronic back pain was ongoing and now worsening. (*Id*., p. 705). Dr. Syed ordered another MRI, continued Plaintiff's narcotic dosage and Klonopin[8] for anxiety, recommended activity as tolerated, smoking cessation, heat therapy, and taking ibuprofen and Tylenol in between the narcotic doses. (*Id*., p. 710). On February 1, 2018, Plaintiff had another MRI of her lumbar spine, which showed progressive discogenic degeneration at L3-4 with grade 1 anterolisthesis[9], modic endplate changes, and posterior disc

---

[7] Ambien is used to treat insomnia in adults and belongs to a class of drugs known as sedative-hypnotics. *See Ambien,* at https://www.webmd.com/drugs/2/drug-9690/ambien-oral/details (last accessed November 15, 2019).

[8] Klonopin is a benzodiazepine use to treat panic attacks. *See Klonopin*, *at* http://www.webmd.com/drugs/2/drug-920-6006/klonopin-oral/clonazepam---oral/details (last accessed November 14, 2019).

[9] In anterolisthesis, the upper vertebral body is positioned abnormally compared to the vertebral body below it. More specifically, the upper vertebral body slips forward on the one below.


bulge.  (*Id*., p. 750).  It also showed mild to moderate right and moderate left foraminal stenosis at the L3-4 level.  (*Id*.).  Plaintiff saw Dr. Syed on February 28, 2018, and he recommended weight loss and heat therapy for her chronic back and knee pain.  (*Id*., p. 748).  He also performed ongoing opioid therapy monitoring and found Plaintiff's opioid use was effective for analgesia, with no adverse side effects, activities of daily living were approved, and no aberrant drug taking behaviors were noted.  (*Id*., p. 748).

On March 23, 2018, Plaintiff met with Theresa Horton, Ph.D., for a mental consultative examination.  (*Id*., pp. 737-41).  Dr. Horton diagnosed Plaintiff with borderline personality disorder, chronic post-traumatic stress disorder, and early onset cyclothymia.  (*Id*.).  Dr. Horton opined Plaintiff appeared to function within the low average range of intellectual functioning, with appropriate reasoning skills, and appeared to attend and concentrate within normal limits.  (*Id*.).  Plaintiff reported she could drive locally, but not in unfamiliar areas; that she chose where to shop based on places without a lot of people; she had very few friends and saw them perhaps once a week; and, while she did take her daughter to kindergarten, she did not participate with the classroom.  (*Id*., p. 740).  Dr. Horton opined that Plaintiff had the capacity to communicate in an intelligible and effective manner, sustained a reasonable degree of cognitive efficiency, and she was able to track and respond to various kinds of questions and tasks with a somewhat slow pace but without distractibility.  (*Id*.).  She further opined that Plaintiff's ability to persist appeared adequate, but she displayed remarkable psychomotor slowing, and in terms of mental status type tasks, capacity to perform within an acceptable time frame was slightly below

---

The amount of slippage is graded on a scale from 1 to 4. Grade 1 is mild (20% slippage), while grade 4 is severe (100% slippage). *See anterolisthesis at,* https://www.cedars-sinai.edu/Patients/Health-Conditions/Anterolisthesis.aspx (last accessed November 15, 2019).

average. (*Id.*).

### III.   Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Only if he reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in light of her residual functional capacity. *McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982), *abrogated on other grounds by Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

## IV. Discussion

Plaintiff raises a single issue on appeal: Whether the ALJ erred in making his RFC finding by failing to properly consider her obesity, chronic edema, and neuropathy in her lower extremities, left knee pain, and medication side effects. (ECF No. 15, pp. 4-5, 8-9). Plaintiff explicitly accepts the ALJ's findings as to her medically determinable impairments, and that none of her impairments met or medically equaled the severity of listed impairments in 20 CFR Part 404, Subpart P, Appendix One. (*Id.*, pp. 4-5).

RFC is the most a person can do despite that person's limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). It is defined as the individual's maximum remaining ability to do sustained work activity in an ordinary work setting "on a regular and continuing basis." 20 C.F.R. §§ 404.1545(b)-(c), 416.945(b)-(c); Social Security Ruling (SSR) 96-8p. It is assessed using all relevant evidence in the record. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). This

includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003). Nevertheless, in evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively. *Cox v. Astrue*, 495 F. 3d 614, 619 (8th Cir. 2007) (citing *Lauer v. Apfel*, 245 F.3d at 704); *Dykes v. Apfel*, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam) ("To the extent [claimant] is arguing that residual functional capacity may be proved only by medical evidence, we disagree."). Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012); 20 C.F.R. §§ 404.1546(c), 416.946(c).

Regarding Plaintiff's obesity, the ALJ specifically considered the impact of her obesity on both her back pain and lower extremity pain. (ECF No. 12, p. 29). He found that she had done relatively well with the use of pain medication since her surgery. (*Id*.). The ALJ also considered that although physical therapy, weight loss, and treatment with a pain specialist had all been recommended, there was no evidence that Plaintiff followed any of those treatment recommendations. (*Id*.). While evidence dated prior to Plaintiff's L3-4 microdiscectomy

indicates she had tried physical therapy without success, she was also referred to physical therapy for both her back pain and neuropathic left leg pain in November 2015 after her surgery. (*Id.*, pp. 378, 388). The lack of any physical therapy records during the relevant time period suggests she did not follow the recommendation for physical therapy. Finally, the ALJ considered the lack of any assessment of limitations greater than those in his RFC findings. (*Id.*, p. 29). Plaintiff correctly points out that the ALJ's reference to Dr. Johnson's restriction of lifting no more than 20 pounds cites a record created two years prior to the most recent MRI (ECF No. 15, p. 7); however, that does not invalidate the ALJ's assessment of her limitations due to obesity, as there is no later evidence of any physician assessing any greater limitations.

Plaintiff also argues the ALJ erred in his evaluation of her edema and neuropathy in her lower extremities. (ECF No. 15, pp. 5, 8-9). The medical evidence of record reveals two separate diagnoses regarding Plaintiff's lower left extremity. She was treated throughout the relevant time period for neuropathic leg pain and weakness affecting the left side; then, in late 2017, she was also diagnosed with degenerative arthritis of the left knee. (ECF No. 12, pp. 350, 364, 373, 692, 700, 703). The ALJ considered Plaintiff's history of treatment for neuropathic leg pain and weakness affecting her left side including: reports before the relevant time period of leg pain and weakness; referrals to physical therapy; recommendations from both Dr. Syed and Dr. Johnson that Plaintiff increase her physical activity and lose weight; physical examination findings of normal gait and sensation; and, Dr. Syed's recommendation that Plaintiff use a walker. (*Id.*, pp. 27-29).

The ALJ did not specifically discuss Plaintiff's allegations of neuropathy with edema in his RFC assessment, however, he found at step two this was not a medically determinable impairment. (*Id.* p. 22). Further, there is no evidence in the medical record showing findings of

edema in Plaintiff's lower extremities; to the contrary, there are specific and consistent findings of no edema in the lower extremities. (*Id.*, pp. 520, 525, 531, 566, 675, 703). In his step two analysis, the ALJ discussed treatment records from Dr. Syed, who saw Plaintiff in September 2017 regarding a history of left knee pain. (*Id.*, pp. 22-23, 698-700). Dr. Syed noted a decreased range of motion in Plaintiff's left knee, but no redness or swelling. (*Id.*). Additionally, x-rays of the left knee showed only minimal early degenerative spurring about the left medial compartment with no acute bony abnormality. (*Id.*). Dr. Syed opined Plaintiff's pain was most likely due to osteoarthritis and recommended weight loss, heat therapy, and Naproxen when needed. (*Id.*, p. 698). Plaintiff also had one visit with Dr. Cheyne, who diagnosed her with degenerative arthritis of the left knee and gave her an injection. (*Id.*, p. 702-703). Dr. Cheyne noted Plaintiff had normal sensation, good strength and muscle tone in her left leg, as well as good range of motion, but had tenderness and mild effusion in the patellofemoral joint. (*Id.*). Despite his instruction to return for a follow-up in three weeks, there is no evidence she did so. (*Id.*). Based upon this evidence, the ALJ found Plaintiff's left knee and ankle pain were effectively treated with medication and/or injection and did not constitute a severe impairment. (*Id.*, p. 23). While the ALJ did not repeat this arthritis specific analysis in the RFC assessment, he did consider her overall lower left leg pain and the impact of that pain on her RFC. (*Id.*, pp. 27-29).

Plaintiff further argues the ALJ erred in failing to fully consider the side effects of the medications she was prescribed. (ECF 15, pp. 7, 9). She objects to the ALJ's discounting her testimony regarding dizziness and drowsiness based upon her never having discontinued a medication due to side effects. (*Id.*, p. 7). She argues it is common knowledge and reasonable to assume that the hydrocodone/norco she was prescribed would have these effects, and that the

14

medications' warning labels advise of these side effects and indicate individuals taking them should not be exposed to heights or hazards and should not drive or operate machinery. (*Id*.). However, Plaintiff not only never discontinued a medication, she also never reported any adverse side effects of her medications to her treatment providers. (*Id*., pp. 228, 266, 361, 368, 537, 687, 748).

The ALJ also considered Plaintiff's reports of her daily activities, such as helping to care for her four-year-old daughter, doing laundry once or twice a week, driving, shopping for groceries once a month for 2-3 hours, and her report to Dr. Syed on January 23, 2017 that she had recently traveled to Virginia to meet a man she had met online. (*Id*., pp. 29, 241-44, 513). Moreover, because few occupations in the unskilled sedentary occupational base require work in environments with hazards or operation of heavy machinery, or driving, Plaintiff's assertions that the warning labels constitute evidence that she should not be exposed to hazards, drive, or operate heavy machinery are adequately addressed by the RFC findings. SSR 96-9p, 1996 WL 374185, at *9; Pl's Br. at 7. Further, none of the representative jobs the ALJ found Plaintiff capable of performing required operation of heavy machinery, driving, or exposure to heights or hazards.

Plaintiff argues it is well established that most employers would not tolerate an employee that required a regimen of regular hydrocodone to function throughout the day. (ECF No. 15, p. 9). She further argues the ALJ erred by failing to discuss Plaintiff losing her job at BOST, Inc., due to chronic crying episodes, anger outbursts, diminished performance and attendance issues during her final year of employment. (*Id*.). Plaintiff's employment at BOST, Inc. ended in May 2016, at the beginning of the relevant time period. (ECF No. 12, pp. 19, 37, 39-40, 232). There is no indication in the evidence of record, however, that Plaintiff's employer objected to her

prescribed use of hydrocodone or that it was a factor in her losing that job. While Plaintiff does not otherwise explicitly object to the ALJ's assessment of her mental impairments, the ALJ did address Plaintiff's mental symptoms, including crying episodes, anger outbursts, and intellectual limitations. (*Id*., p. 27, 30-31). He considered the results of Dr. Horton's consultative examination performed March 23, 2018. (*Id*., p. 31). He considered and gave great weight to Dr. Horton's findings that Plaintiff presented with an ability to communicate in an intelligible and effective manner; her ability to persist appeared adequate; she displayed psychomotor slowing; and, in terms of mental status type tasks, her capacity to perform within a basically acceptable timeframe was slightly below average. (*Id*., pp. 31, 32). The ALJ considered Plaintiff's treatment records from her complaints of mental distress to her primary care physician, Dr. Syed, in September 2016 through her treatment plan review from WACGC in January 2018. (*Id*., pp. 30-31). Based on this evidence, the ALJ found that Plaintiff had difficulties in interpersonal functions, but she would be able to function in a work environment where her contact with others was limited. (*Id*.). He further found that while her conditions would interfere with her ability to handle complex or detailed tasks, she would be able to handle tasks with the limitations set forth in the RFC. (*Id*.).

As discussed above, the ALJ considered each of Plaintiff's impairments and examined the medical records thoroughly. (ECF No. 11, pp. 21-23). In making his RFC determination, the ALJ considered Plaintiff's testimony and other reports of her symptoms, the treatment records and medical opinions of treating healthcare providers, the opinions of non-examining medical consultants, and the findings and opinions of a consultative examiner. (*Id*.).

An ALJ may decide within a "zone of choice," and reversal is unwarranted simply because some evidence might support a different conclusion. *Heino v. Astrue*, 578 F.3d 873, 879

(8th Cir. 2009). Here, the ALJ's RFC determination falls within the zone of choice and is supported by the medical and other evidence of record.

## V. Conclusion

For the reasons and upon the authorities discussed above, it is recommended that the ALJ's decision be affirmed and the Plaintiff's Complaint (ECF No. 1) be DISMISSED WITH PREJUDICE.

**The parties have fourteen (14) days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 18th day of November 2019.

/s/ Mark E. Ford
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE